**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ARTHUR SCHUMAN, INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**BANCO SANTANDER BRASIL, SA, et al.,**<br><br>**Defendants.** | Civil Action No.: 06-1331 (PGS)<br><br>**OPINION** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on cross motions for summary judgment. Plaintiff, Arthur Schuman, Inc. ("Schuman") is a New Jersey corporation engaged in the business of importing cheese. Defendant Banco Santander Brasil, SA ("Banco Santander") is a Brazilian commercial bank. Defendant S. Teixeira Produtos Alimenticios Ltda. ("Teixeira") is a Brazilian cheese producer. Defendant Solon Teixeira de Rezende Junior ("Solon") is a Brazilian individual and a resident of Sao Paolo, Brazil. Solon is Teixeira's principal owner. Neither Teixeira nor Solon have appeared in this action; thus, the Court evaluates the cross-motions for summary judgment filed by Schuman and Banco Santander.

**I.**

This case involves a dispute over a letter of credit issued by Wachovia Bank, N.A. ("Wachovia") on behalf of Schuman naming Banco Santander as the beneficiary.[1] Schuman has

---

[1] Schuman and Banco Santander entered into a Joint Statement of Stipulated Facts and Exhibits ("Stipulation") on December 17, 2009, in lieu of conducting additional discovery. The

been importing cheese from Teixeira for approximately ten years. (Stipulation ¶ 6.) On March 17, 2005, Schuman obtained its first letter of credit for $1 million from Wachovia naming Teixeira as the beneficiary. The purpose of this initial letter of credit was to secure Schuman's obligation to pay Teixeira for purchased cheese. (*Id.* ¶ 13.) Schuman and Teixeira attempted to use the Wachovia letter of credit to finance Teixeira's production costs in order to ensure that Teixeira could purchase raw materials. (*Id.* ¶ 14.) This first attempt was unsuccessful. (*Id.*) Because of Teixeira's poor credit at the time, Schuman was unable to find a Brazilian bank willing to provide the necessary financing. (*Id.*) Eventually, Schuman and Teixeira approached Banco Santander for the financing. Banco Santander agreed to loan $1 million to Schuman for pre-production financing, provided that a standby letter of credit (the "SBLC") for $1 million naming Banco Santander as beneficiary was made to secure the loan. (*Id.*) The SBLC naming Banco Santander as beneficiary is the letter of credit that is at issue here. (*Id.*)

Extensive negotiations took place between Schuman and Banco Santander with regard to the SBLC. Banco Santander required that it be the beneficiary under the SBLC, and not Teixeira. (*Id.* ¶ 15.) Only then would Banco Santander provide the needed financing to Teixeira to fill Schuman's purchase orders. (*Id.*) Banco Santander was to provide the financing through an "Advance on Export Contracts" (known in the industry as "ACC") transaction. (*Id.*) An ACC transaction is a "Brazilian tax-advantaged short-term export financing, of no more than 360 days, given to Brazilian exporters to acquire raw materials to produce goods for export." (*Id.*) ACC transactions are regulated under Brazilian foreign exchange regulations and registered with the Brazilian Central

---

Court refers to the Stipulation for the majority of facts, as they are undisputed and appropriate for consideration at summary judgment.

Bank. (*Id.*) Under the ACC transaction, payments were to be made to Banco Santander through an intermediary bank abroad, which was Wachovia. (*Id.*) This payment was to be secured by the SBLC. (*Id.*)

The parties held discussions and negotiated the SBLC via email correspondences. Both parties rely upon these emails in defending their interpretation of the SBLC. On or about March 22, 2006, a Banco Santander loan officer sent an email to a number of individuals, including Angie Mendenhall of Wachovia's letter of credit department and Kevin Lehoullier, Schuman's Chief Financial Officer, proposing terms for the SBLC. (*Id.* ¶ 16.) Several emails were exchanged between these parties concerning the terms. (*Id.*) Schuman refused to be obligated for any interest, costs and expenses that Teixeira may incur; Schuman also wanted to ensure that Banco Santander could only draw down on the SBLC in connection with Schuman's business with Teixeira, as opposed to any other loans that Banco Santander might issue to Teixeira. (*Id.*) Because of the short-term life of the ACC loans (240 days here), Banco Santander and Schuman considered the possibility that the production of the cheese would not be complete by the loans' maturity date. (*Id.* ¶ 18.) Therefore, Banco Santander requested that it be able to draw upon the SBLC when the loans came due, regardless of whether the cheese had been shipped to Schuman. (*Id.*)

On April 7, 2005, Teixeira sent an email to Schuman, expressing Banco Santander's concern: "The main point of all, as you may see in the request of the santander [sic] bank is that the sblc needs to cover the period before shipment and the credit facility that they are making to us as Advance on Export Contract." (*Id.* ¶ 19.) On the same date, Schuman responded stating: "If the only change is the unshipped product then it should be no problem. If they add wording that suggests we would be liable for additional costs and expenses then I don't think we can agree to that." (*Id.* ¶ 20.)

Also, Schuman was concerned that it could be liable for payment twice: both for the unpaid loans to Banco Santander and any unpaid invoices from Teixeira. (*Id.* ¶ 25.) On April 12, 2005, Schuman expressed this concern of double payment to Solon by email saying that "the wording needs to be such that Arthur Schuman Inc. is not exposed in the event that Teixeira does not repay its obligation to Santander." (*Id.* ¶ 28.) In response, Solon indicated that the latest draft from Banco Santander addressed all these concerns because "Banco Santander would need unpaid invoices to claim a payment under the SBLC." (*Id.* ¶ 29.)

On April 15, 2005, Schuman's CFO requested that a "change to the . . . wording regarding invoices to reflect that the invoices described [by the letter of credit, to be relied upon by Banco Santander for purposes of making a draw] are for merchandise invoiced by Teixeira but not necessarily yet shipped to Arthur Schuman Inc. are presented and marked as unpaid and past due." (*Id.* ¶ 31.) Schuman proposed that Banco Santander attach any Teixeira invoices "marked as unpaid and purportedly signed by an authorized [Teixeira] representative" to any draws made under the SBLC. (*Id.* ¶ 32.) Schuman, Teixeira, and Banco Santander all agreed on this proposed language change with regard to invoices. (*Id.* ¶ 33.) At this point, only Wachovia (Schuman's bank), had to approve the SBLC language. On April 15, 2005, a Wachovia representative sent an email to Schuman and Banco Santander deleting certain proposed language from the parties. The language Wachovia deleted was the following:

> THE INVOICE(S) ARE ATTACHED HEREWITH MARKED AS UNPAID AND PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF [TEIXEIRA] STATING THAT: THE AMOUNT OF THIS DRAWING REPRESENTS FUNDS DUE TO [TEIXEIRA] FROM ARTHUR SCHUMAN INC. FOR PAYMENT OF THOSE CERTAIN INVOICES THAT ARE PAST DUE AND REMAIN UNPAID. FUNDS TO COVER HAVE NOT BEEN

> RECEIVED FROM ARTHUR SCHUMAN INC. OR ANY OTHER SOURCE.

(*Id.* ¶ 35.) Wachovia also struck the language: "COPIES OF INVOICE(S) MARKED UNPAID."

(*Id.* ¶ 36.) Wachovia explained that the invoices could not be attached or presented via a SWIFT electronic-money transfer and thus suggested deleting the reference to invoices being attached. (*Id.*) Banco Santander responded that the changes were acceptable to them because it was Schuman that requested the additional language with respect to the attached invoices. Schuman stated that "it requires the wording of the invoices to protect us by making the trade invoices and business tied to the line of credit. Without that[,] Teixeira could use the funds for stock or other investment purposes not tied to the purchase of cheese products." (*Id.* ¶ 37.) Therefore, the language was altered one last time before it was agreed to by all the parties involved.

On April 19, 2005, Wachovia issued the final agreed upon SBLC to Banco Santander as the beneficiary. The final language of the SBLC provided in pertinent part:

> WE [WACHOVIA] HEREBY UNDERTAKE TO HONOR ANY CLAIM MADE BY YOU [BANCO SANTANDER] UP TO THE AMOUNT OF USD 1,000,000.00 (ONE MILLION OF US DOLLARS) IN PRINCIPAL, IN THE TERMS AND CONDITIONS AS FOLLOWS:
>
> WE HEREBY AGREE WITH YOU THAT ANY DRAWING UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS STANDBY LETTER OF CREDIT SHALL BE DULY HONORED UPON YOUR FIRST DEMAND BY AUTHENTICATED SWIFT, STATING THAT:
>
> WE BANCO SANTANDER BRASIL S.A. - SAO PAULO-BRAZIL, CLAIM PAYMENT UNDER YOUR STANDBY LETTER OF CREDIT NUMBER SM213305W AND HEREBY CERTIFY THAT S. TEIXEIRA PRODUTOS ALIMENTICIOS LTDS LOCATED AT RUA SARAH DE SOUZA, 174-SAO PAULO/BRAZIL HAS FAILED TO COMPLY WITH THAT

>CERTAIN PAYMENT OBLIGATION OF CREDIT FACILITY (ACC) DATED (CREDIT FACILITY DATE) GRANTED BY BANCO SANTANDER BRASIL S.A. TO TEIXEIRA PRODUTOS ALIMENTICIOS LTDA IN RELATION TO THE INVOICE(S) NBR (INVOICE NBR.), DATED (INVOICE DATE), WHICH WERE INVOICED BY S. TEIXEIRA PRODUTOS ALIMENTICIOS LTDS TO ARTHUR SCHUMAN INC. THAT ARE PAST DUE AND REMAIN UNPAID. WE THEREFORE DEMAND PAYMENT IN THE AMOUNT OF (INSERT AMOUNT) AS SAME IS DUE AND OWING.

Additionally, the SBLC stated that "WE ARE INFORMED THAT THIS LETTER OF CREDIT COVERS CREDIT FACILITIES (ACC) GRANTED TO [TEIXEIRA]." (*Id.* ¶ 40.)

Immediately following Wachovia's issuing of the SBLC, Banco Santander made five ACC loans to Teixeira in the amount of $1 million. (*Id.* ¶ 42.) Teixeira failed to pay back any of these loans by the due date (December 31, 2005). (*Id.*)

In early December 2005 the maturity dates on the ACC loans were advancing quickly and Teixeira had yet to make a payment. At that time, Silvia Cristina Lessa Soler Tello ("Tello")[2] from Banco Santander's international trade department advised Geraold Jose Rodrigues Alckimin Neto ("Neto"), the loan officer at Banco Santander who had negotiated the SBLC, to gather the specific invoices that are mentioned in the "guarantee." (*Id.* ¶ 43.) Neto responded to Tello as follows: "Please confirm whether it is necessary to present the invoice. Since the merchandise has not been shipped, I do not possess invoices." (*Id.* ¶ 44.) Tello responded to Neto via email about "pro forma" invoices for goods not shipped[3]:

---

[2] Prior to this date, Tello had little involvement in the negotiations of the SBLC.

[3] Possibly the goods were not ever produced as of this date, because several months later cheese production had not occurred. In early March 2006, Teixeira requested of Schuman whether it wanted the cheese because "I am finding the way to re start production and shipping."

> The SBLC text below mentions that the SBLC was given to guarantee the ACC in relation to invoices XXX; that is, if the invoice was not presented to the banker for payment, it might even raise a case for the payment, since it was the very banker that requested that these invoices be specified in the SBLC; and I believe this was at the request of the Company abroad.
> Try to request it from the company, even if it is [a] pro-forma invoice. The company can issue that even if it has not shipped the merchandise.

(*Id.* ¶ 45.)

On or about December 8, 2005, after receiving this email, Neto requested that Teixeira issue the invoices. (*Id.* ¶ 46.) Teixeira then issued to Banco Santander copies of four "pro forma" invoices[4] made out to Schuman for product that was due to Schuman under open Schuman purchase orders, but had not yet shipped to Schuman.[5] (*Id.*) Teixeira also provided Banco Santander with a "shipping schedule" that showed the dates Teixeira planned to ship the cheese to Schuman under those purchase orders. (*Id.*) These "pro forma" invoices, signed by Teixeira, were dated December 8, 2005 (the same date that Banco Santander requested invoices from Teixeira), and stated that payment by Schuman was required within forty-five days (around February 15, 2006). (*Id.*) The invoices were addressed to Schuman and contained such information as: FDA registration numbers, quantities, product codes, product description, unit and total pricing terms, and the Schuman

---

[4] The definition of a "pro forma" invoice is an issue.

[5] The product was not made either. According to Schuman, there existed two pending contracts with Teixeira: Purchase Contract 5069 and Purchase Contract 5110. Schuman alleges it received its last shipment from Teixeira in August 2005 in accordance with Purchase Contract 5069, and Schuman alleges it fully paid all invoices with respect to Purchase Contract 5069. As to Purchase Contract 5110, Schuman alleges it never received a single shipment or invoice with regard to that open purchase order. Thus, there was no activity on Purchase Contract 5110 between Schuman and Teixeira since before the SBLC had been issued and up to the time that Banco Santander requested pro forma invoices.

7

purchase order numbers and proposed shipping dates. (*Id.* ¶ 47.) Schuman never received the pro forma invoices at this time.

On February 15, 2006, Schuman attempted to cancel the SBLC.[6] (*Id.* ¶ 49.) Schuman directed Wachovia to send a SWIFT message to Banco Santander requesting cancellation of the SBLC. Banco Santander refused to cancel the SBLC. (*Id.* ¶ 49.) At this point in time, the loans to Teixeira were past-due and the 45-day payment term on the "pro forma" invoices Teixeira had sent to Banco Santander had past, and to Banco Santander's knowledge the invoices were unpaid. (*Id.* ¶ 50.)

On February 20, 2006, Banco Santander attempted payment under the SBLC from Wachovia. (*Id.*) Two days later Banco Santander sent Wachovia a follow up message inquiring on the status of the draw down request. (*Id.* ¶ 51.) On March 1, 2006, Wachovia refused Banco Santander's request stating that "we have determined that drawing is not is not in accordance with the terms and conditions of the letter of credit." (*Id.* ¶ 52.) Immediately thereafter on the same day, Banco Santander sent Wachovia another SWIFT demand. This time the request specifically listed four invoices from December 8, 2005 that were individually numbered one through four (PI-001/2005-December 08, 2005). The draw request stated that it was made because Teixeira had defaulted on its obligations and based upon "invoices by S. Teixeira Produtos Alimenticios Ltda to Arthur Schuman Inc. that are past due and remain unpaid." (*Id.* ¶ 53.) On March 3, 2006, Wachovia made payment to Banco Santander under the SBLC in the amount of $999,600. (*Id.* ¶ 54.) Wachovia debited Schuman's account in New Jersey in the amount of $1,001,100 (includes a transaction fee).

---

[6] Although not stated in the Stipulation, the Schuman purchase order was approximately a year old at this time and Teixeira had not made any progress on producing or shipping the product.

(*Id.*) At the time payment was made, Schuman still had open purchase orders with Teixeira, and had not informed Teixeira or Banco Santander that it intended to cancel these purchase orders. (*Id.* ¶ 55.)

When Schuman learned Banco Santander has received a payment under the SBLC, it immediately contacted Banco Santander to inform them that Teixeira had not shipped cheese to Schuman in months and that there were no outstanding invoices. (*Id.* ¶ 56.) Banco Santander refused to reverse the transaction because it had received outstanding "pro forma" invoices from Teixeira.

On March 6, 2006, Schuman contacted Teixeira to inquire about the invoices Banco Santander claimed to have received. (*Id.* ¶ 57.) At first, Teixeira denied having provided any invoices to Banco Santander. A Teixeira employee responded via email stating "I am checking out where they got the invoices, cause we didn't sent [sic] it to them!" (*Id.*) On March 29, 2006, Banco Santander sent Schuman the signed and authorized Teixeira invoices that it had received, along with the proposed shipping schedule it had received from Teixeira. (*Id.* ¶ 58.) At that point in time, Teixeira acknowledged to Schuman that it had in fact sent these "pro forma" invoices to Banco Santander. (*Id.*) Neither party disputes that Schuman never received these invoices from Teixeira prior to payment under the SBLC. (*Id.*)

After Banco Santander received payment under the SBLC, Teixeira sent an email to Schuman inquiring: "I would like to know if you still need the cheese of this open contract cause I am finding the way to re start production and shipping." (*Id.* ¶ 59.) Thus, it is likely that at the time the "pro forma" invoices were sent to Banco Santander product had not been made. (*Id.*) In discussing Schuman's response, Schuman's president stated: "I wouldn't say yes to taking cheese until l/c mess is straightened out. If you say yes, there may be a way santander can interpret lc/collection." (*Id.*)

9

## II.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact, and that the evidence establishes the movant's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of fact exists only if a reasonable jury could return a verdict for the non-movant, and it is material only if it may affect the outcome of the suit based upon substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

After the movant has satisfied this burden, the non-moving party must establish that a genuine issue of material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rather, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48.

"Actions concerning letters of credit are well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents." *Banque Worms v. Banque Commerciale Privee* 679 F.Supp. 1173, 1178 (S.D.N.Y. 1988), *aff'd*, 849 F.2d 787 (2d Cir. 1988); *accord Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612

F.Supp. 1533, 1537 (S.D.N.Y. 1985), *aff'd*, 808 F.2d 209 (2d Cir.1986); *Data General Corp. v. Citizens National Bank*, 502 F.Supp. 776, 779 (D.Conn. 1980); *West Va. Housing Development Fund v. Sroka*, 415 F.Supp. 1107, 1110 (W.D.Pa.1976). Nevertheless, even in a letter of credit case summary judgment is inappropriate when there are genuine issues of material fact.

### III.

Schuman alleges that Banco Santander made an invalid draw on the SBLC. Schuman asserts that "[w]hen Banco Santander requested payment under the SBLC, it warranted that its request was free from fraud and that the request did not violate any agreement between Schuman and Banco Santander." Schuman alleges that Banco Santander committed fraud by requesting that Teixeira issue "pro forma" invoices to Banco Santander that were improperly used to draw down on the SBLC. Schuman disputes same because no actual unpaid invoices existed, since Teixeira had never issued the invoices to Schuman that were relied upon in payment under the SBLC.

Revised Article 5 of the U.C.C. governs letters of credit including warranties against fraud.[7] "If its presentation is honored, the beneficiary warrants . . . to the issuer . . . that there is no fraud or forgery." N.J.S.A. 12A:5-110(a)(1). Generally, this means that Wachovia honored the SBLC because payment was "given value in good faith and without notice of forgery or material fraud." N.J.S.A. 12A:5-109(a)(1). In this case, Banco Santander's action may constitute fraud. Tello insisting on collection of a "pro forma" invoice from Teixeira is suspect considering the product may

---

[7] The parties dispute over whether New Jersey or North Carolina should apply. However, they concede that the Uniform Commercial Code is incorporated in both state statutes, which governs this case. There is no material difference between the laws and the Court would reach the same result. Plaintiffs cite to the New Jersey statute containing the U.C.C. The Court shall apply New Jersey law here, but shall use the conventional U.C.C. citation for purposes of clarity. *See Banco Nacional de Desarrollo v. Mellon Bank, N.A.,* 726 F.2d 87, 90-91 (3d Cir. 1984); *In re Montgomery Ward, LLC,* 292 B.R. 49, 53 (Bankr. D. Del. 2003).

not have been made and certainly not near ready for shipment. *See Roman Ceramics Corp. v. Peoples National Bank*, 714 F.2d 1207, 1210-11 (3d Cir. 1983).

The Third Circuit has held that the issue of fraud within a letter of credit requires a trial of the facts. *See Roman Ceramics,* 714 F.2d 1207. The *Roman Ceramics* court determined, after holding a nonjury trial, that a material "fraud in the transaction" occurred; there was significant evidence that the beneficiary had allocated funds improperly to more recent invoices in order to keep older invoices unpaid. *Roman Ceramics*, 714 F.2d at 1215. In upholding the ruling, the Third Circuit found the beneficiary's conduct "so vitiates the entire transaction that the legitimate purpose of the independence of Roman's letter of credit with [Bank] are no longer served." *Id.* (internal citations omitted).

According to one definition, a pro forma invoice is a "template" for a later issued commercial invoice. *See* John F. Dolan, *The Law of Letters of Credit* ¶ 1.07[1][b] (4th ed. 2009). Similarly, the dictionary definition of a "pro forma" invoice is "a document provided prior to or with a shipment of goods (as for export) that describes the items and terms of sale but does not have the function of a real invoice." *See* Merriam-Webster's Collegiate Dictionary (11th ed). On the other hand, an "invoice" is simply described as "an itemized list of goods shipped usually specifying the price and the terms of sale." Thus, the understanding of a pro forma invoice is that it is a preliminary template with no function except to illustrate what a "real" invoice will detail.

Tello's concoction of procuring pro forma or "template" invoices to satisfy the terms of the SBLC seems very deceptive. Banco Santander's intent in requesting pro forma or template invoices raises the issue of fraud. Determination of whether fraud occurred is a factual question. Extensive negotiations on the SBLC took place between the parties. No one ever mentioned pro forma or

template invoices as satisfactory. Common sense dictates that Schuman would never have agreed to such pro forma invoices. Tello demanding pro forma invoices from Teixeira shows his manipulation of the terms of the SBLC on behalf of Banco Santander. As noted above, intent is a factual question.[8] *See Wood v. R.R. Donnelley & Sons Co.,* 888 F.2d 313, 319 (3d Cir. 1989) (remanding letter of credit case to the district court to determine factual issues with respect to fraud allegations under the U.C.C.'s warranty provision). *See also Worldwide Labor Support of Illinois, Inc. v. Cura Group, Inc* 2009 WL 961485, at *10-11 (D.N.J. 2009) (holding that because plaintiff alleged defendants committed fraud, "summary judgment for Defendants is not appropriate based on the element of intent"); *Farmers & Merchants Nat. Bank v. San Clemente Financial Group Securities, Inc.*, 174 F.R.D. 572, 578 (D.N.J. 1997) (stating that material factual dispute regarding intent of the parties as to fraud precluded summary judgment).

In its brief for summary judgment, Schuman writes that "the extensive negotiations between Banco Santander and Schuman gave rise to an agreement that Banco Santander would not make a claim for payment under the SBLC unless (i) Teixeira defaulted on loans relating to invoices rendered to Schuman and (ii) Banco Santander certified that those invoices were past due and unpaid." Banco Santander maintains that it provided exactly this certification to Wachovia; however, a reasonable understanding of a requirement that "unpaid" invoices be presented would

---

[8] Additionally, the *Roman* court held a nonjury trial with regard to the issue of fraud, as it was not appropriate to consider fraud under the U.C.C. warranty provision without a fact sensitive review. Moreover, several of the cases that the parties have proffered as authority involved full trials on the facts surrounding the alleged fraud. *See, e.g.*, *Spiegel Holdings, Inc. v. Office of Comptroller of Currency of U.S.,* 2004 WL 1721806 (D. Or. July 30, 2004) (holding that the transaction violated the U.C.C. warranty provision after holding a nonjury trial); *Vukovich v. Haifa, Inc.*, 2007 WL 655597 (D.N.J. Feb. 27, 2007) (denying in part summary judgment based upon fraud allegations).

be that actual, real invoices had to be submitted to Schuman in the regular course of business.  It is difficult to fathom that a pro forma or template invoice meets the SBLC requirements.[9]

## IV.

The Court denies Banco Santander's motion for summary judgment as to the remaining common law claims.  The same facts that are pertinent to the fraud claim are also necessary to determinations as to the common law causes of action.  Thus, summary judgment is inappropriate.  Likewise, Schuman's motion for summary judgment is denied.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

March 10, 2010

---

[9] The record evidences the fact that Schuman originally proposed that actual invoices should be attached to demands under the SBLC.  Banco Santander agreed to this requirement.  However, Schuman's own bank, Wachovia, told Schuman that it was not practical to attach actual invoice documents, and it recommended simply using invoice numbers and invoice dates written into any future requests.  Clearly, Banco Santander understood Schuman's intention to be that actual invoices be used to make requests under the SBLC.